IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Manor Care, Inc.,

            Plaintiff,                              Case No. 3:03CV7186

            v.                                   ORDER

First Specialty Insurance Corporation,

            Defendant.

This is a declaratory judgment action. Plaintiff Manor Care, Inc., (Manor Care) seeks a determination of its rights under its insurance agreement with the defendant, First Speciality Insurance Corporation (First Specialty).

Jurisdiction exists pursuant to 28 U.S.C. § 1332.

Pending are counter-motions for summary judgment. For the following reasons, those motions shall be granted in part and denied in part.

**Background**

Manor Care owns and operates assisted living facilities throughout the United States.[1] Until June 1, 2000, it purchased insurance from First Specialty for "professional incident" liability.[2] This

---

[1]

Manor Care is the successor-in-interest, via a merger, of the former Manor Care, Inc., and HealthCare and Retirement Corp. Both companies maintained independent insurance coverage prior to that merger.

[2]

As of June 1, 2000, First Specialty declined to offer renewal of the policy, stating that, as a result of increased litigation, it could not price such coverage with any accuracy.

policy covered injuries attributable to the facility's deficient care, including, but not limited to, events such as: 1) bones broken when a resident is dropped while being moved; 2) bedsores stemming from failure to turn a resident; 3) malnutrition resulting from a poor dietary plan; 4) dehydration; 5) skin rashes; and 6) infections.[3]

Put simply, First Specialty agreed to assume Manor Care's liability for each "triggering event" in excess of a $500,000 "Self-Insured Retention" (SIR) up to an aggregate amount of $25 million in total for all claims made under the policy.

Manor Care contends that during the 1990s the nature and character of negligence litigation in its industry changed. It claims the plaintiffs bar began to target nursing homes, alleging not isolated incidents of negligent care, but rather overarching deficiencies in the facilities' "care plans" for residents. Litigants and their attorneys, according to Manor Care, began to assert that each individual accident or injury to a resident was traceable to a single, unifying cause - the negligent care plan. Manor Care claims that it purchased the First Specialty policy as a direct consequence of these developments in the litigation being brought against it and other nursing home operators.

First Specialty neither confirms nor rejects that account. It merely argues the policy is clear in what it provides. The recent history recounted by Manor Care, First Specialty contends, is irrelevant because the policy's terms are unambiguous.

The parties contest a wide variety of topics. They disagree as to: 1) what constitutes a triggering event under the policy; 2) whether a lawsuit is a single "triggering event" for purposes

---

[3] The insurance here is distinct from medical malpractice insurance. At issue with this policy is the nursing home's standard of care, not a physician's, allegedly, negligent treatment.

of the policy or if each separate injury alleged in the lawsuit is distinct;[4] 3) the extent of First Specialty's exposure once a "triggering event" occurs; 4) how settlement damages stemming from suits alleging covered injuries and also injuries not covered by the policy are to be apportioned; and 5) whether Manor Care breached its duty of good faith to First Specialty, particularly with respect to claims handling procedures.

The parties have selected nine representative test cases to litigate first and filed summary judgment motions with respect to pertinent issues in those cases. The particular facts of the individual cases, however, are less important here than identifying the precise meaning of the policy's terms. This order, accordingly, addresses and resolves the parties' differing interpretations as a matter of law.

## Discussion

## 1. What Constitutes a "Triggering Event"

The parties dispute what must occur to implicate the policy. Manor Care contends any "professional incident" within the policy period, regardless of when an injury results, triggers the policy. Professional Liability Coverage Form, § I(1)(b). First Specialty disagrees, and asserts that both conduct and resulting injury must occur during the policy period.

---

[4]

This distinction matters because a separate SIR applies to each "claim" under the policy. Endorsement No. 2. Thus, whether a lawsuit constitutes one or multiple claims determines the parties' respective exposures.

As an example, consider a resident suing Manor Care for malpractice, alleging four separate injuries each causing $1 million in damage. Under Manor Care's reading of the policy, only one SIR would apply per lawsuit, and Manor Care would pay $500,000 of the resident's claim and First Specialty would pay the remaining $3.5 million. Under First Specialty's view, a separate SIR would apply to each injury alleged in the lawsuit, regardless if they were brought together. Manor Care, accordingly, would pay $2 million to the resident and First Specialty would pay the remaining $2 million.

First Specialty's interpretation is correct: the policy only applies when injury occurs during the policy period.

At issue in this case is only the "excess liability" insurance in the agreement. That policy states, with respect to that coverage:

> [First Specialty] will pay on behalf of the insured those sums in excess of primary insurance, that the insured becomes obligated to pay as damages for liability imposed on the insured by law or assumed under an insured contract provided . . . [t]hey are caused by an occurrence which takes place during our policy period.

Excess Liability Policy, § I(A).

The policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same harmful conditions, *which results during the policy period in personal injury* or property damage." Excess Liability Policy, Definitions § K (emphasis added). Accordingly, both the relevant conduct, and the injury for which the insured seeks coverage, must occur during the policy period.

Manor Care seeks to avoid this interpretation in two ways. First, it notes that most specifically defined terms in the agreement appear bold-faced while "occurrence" in this context is not. It argues, therefore, that "occurrence" here has a different meaning than as stated in the definition provisions.

This argument is unconvincing. A party's failure to use boldface type wherever it uses a contractually defined term does not require the term is to have some other meaning. *Miller v. ACE USA*, 261 F. Supp. 2d 1130, 1137 (D.Minn. 2003) ("When readily discernable, the parties intent and the obvious purpose of the contract as a whole must govern.") (internal quotations omitted). In that case, the court refused to give a defined term, when it was not in boldface type, a different meaning than that required under the definitions section when boldface type was used. *Id.*

4

Here, the word "occurrence" appears repeatedly in the clauses at issue, always referring to the same antecedent, and in boldface type in almost every other instance. Put simply, the contract makes little sense if the meaning of "occurrence" varies depending on the type style, without any other indication that such variance was intended. In these circumstances, this appears to be nothing more than a scrivener's error.

The definition defines a triggering event. To hold the definition does not apply where it is most likely that it would apply undercuts the purpose of giving the term a specific meaning. There being no reason other than the disparity in typeface for attributing an intent to the parties to use a defined term in multiple ways, I conclude that the most coherent, and most rational, interpretation is to apply the term uniformly throughout the policy.[5]

Second, Manor Care argues First Specialty agreed to amend the policy, and change what triggers the coverage.

Endorsement No. 1, a supplement to the policy, defines the primary layer of insurance coverage which is to be expended before First Specialty's excess coverage is reached. Under this endorsement agreement, Manor Care acknowledged that the primary insurance would be self-insured. Endorsement No. 1, "Self Insured Retention." That document stated Manor Care's understanding and imposed on it certain obligations, such as duties of care to First Specialty, the excess insurer.

---

[5]

Manor Care relies on a Colorado case to suggest non-bolded terms must be given their ordinary meanings. *State Farm Mut. Ins. Co. v. Stein*, 940 P.2d 384, 388 (Colo. 1997). In that case, however, the insurance contract included separate subsections, each with its own definitions. *Id.* The court refused to apply a definition of a bolded term within one subsection to the same term, not bolded, in another subsection. *Id.* Here, however, the definition at issue applies to the whole policy, and the Colorado case is not on point.

5

In addition, the document also required First Specialty to follow the terms of a separate, specifically referenced general liability policy, the "CG00011188 Policy," with respect to the self-insured coverage. *Id.* Under this "CG00011188 Policy," only a "professional incident," defined as "[a]ny act or omission in the furnishing or failure to furnish professional services," is required to trigger coverage. CG00011188 Policy, § I(1)(b). Manor Care, therefore, contends First Specialty agreed to abide by the terms of this other policy and its trigger provisions, the "professional incident" language, applies.

The argument fails. Endorsement No. 1 specifically states that First Specialty's "CG00011188 Policy" obligations exist only with respect to the SIR. That clause, by its own terms, only defined the defendant's rights and responsibilities with regard to the SIR. The provision says nothing about First Specialty's excess liability coverage. In addition, nothing in two endorsements makes any reference to the specific trigger provision in the master agreement.

The First Specialty policy, moreover, specifically distinguishes between terms defined in its excess policy and those used in the primary insurance policy. Excess Liability Policy, § I(A)(2). The First Specialty policy states that the definitions in the latter shall not apply to defined terms in the former. *Id.* Thus, only the First Specialty policy's specifically defined term "occurrence" triggers coverage.

## 2. Multiple SIRS May Apply to a Single Lawsuit

The parties interpret differently how complex lawsuits implicate the coverage. A number of former residents and their estates have brought suits against Manor Care. Many cases allege several different incidents, accidents, and injuries in the complaint. Oftentimes, the separate allegations stem from distinct causes and, for all purposes other than the lawsuit, have nothing to do with one

6

another. In other cases, the litigants allege all of their injuries are traceable to an initial care plan that was negligent *ab initio*.

The First Specialty policy, as noted *supra*, imposes a $500,000 SIR before excess coverage applies. Manor Care argues each lawsuit is a single claim under the policy and, consequently, it is only responsible for one SIR per lawsuit. In contrast, First Specialty contends that the bundling of incidents into a single lawsuit has no relevance to the SIR obligation. Multiple SIRS, First Specialty contends, can apply within a single lawsuit alleging multiple events and injuries.

First Specialty's interpretation is correct. Endorsement No. 2, a second supplement to the policy, states that the SIR applies "$500,000 each occurrence." That document is part of the policy as a whole, and the First Specialty policy's definition of occurrence, therefore, applies. Though Manor Care contends "[t]he SIR was to be applied per qualifying occurrence, which means per claim or underlying suit," it offers no support for that reading. It reiterates its earlier "non-bolded" term argument, but that contention remains unhelpful.

The "occurrence" reading is also consistent with how Ohio courts treat insurance contracts. In this state, "proximate cause is an integral part of any interpretation of the words accident or occurrence as used in a contract for liability insurance." *Progressive Preferred Ins. Co. v. Derby*, 2001 WL 672177, *3 (Ohio App.). Thus, "where there is but one proximate, uninterrupted and continuous cause, all injuries and damages are included within the scope of that single proximate cause." *Id; see also Mich. Chem. Corp. v. Amer. Home Assur. Co.,* 728 F.2d 374, 378-83 (6th Cir. 1984).

The converse is also true: Where there are multiple proximate causes, each is a separate occurrence under an insurance contract. *Id*. This reading of the policy is, consequently, consistent

7

with how Ohio courts have read and applied similar policies. Thus, the policy language requires the parties to determine how many "occurrences" exist in each lawsuit and apply that many SIRs to each action.[6]

Manor Care disputes that reading. It contends a course of performance, evidencing an understanding that a single SIR applies to each lawsuit, exists between it and First Specialty. The plaintiff argues that it relied on this course of performance to its detriment when it regularly renewed its coverage with First Specialty.

Though Manor Care has submitted significant evidence of the litigants' prior dealings, its course of performance evidence is irrelevant in these circumstances:

> Only when the language of a contract is unclear or ambiguous, or when the circumstances surrounding the agreement invest the language of the contract with a special meaning will extrinsic evidence be considered in an effort to give effect to the parties' intentions. When the terms in a contract are unambiguous, courts will not in effect create a new contract by finding an intent not expressed in the clear language employed by the parties.

*Shifrin v. Forest City Enters., Inc*., 64 Ohio St.3d 635, 638 (1992) (citations omitted).

---

[6]

Courts in other jurisdictions also apply the proximate cause approach. *See, e.g., St. Paul Fire & Marine Ins. Co. v. Hawaiian Ins. & Gaur. Co.*, 2 Haw. App. 595, 596 (1981) (three separate acts of negligence constitute three claims for insurance policy limit purposes).

Here, the language of the policy is clear.[7] Any evidence concerning course of performance is, accordingly, irrelevant to the issue of contract interpretation. Multiple SIRs may, therefore, apply to a single lawsuit, depending on the number of occurrences.[8]

### 3. "All Sums" v. "Those Sums"

In further support of its position that the timing of the injury is irrelevant, Manor Care contends certain "all sums" decisions under Ohio insurance case law obligate First Specialty to respond in full for all damages, and then seek contribution, if any, from other insurers.

Put simply, Manor Care argues First Specialty's policy is an "all sums" policy and the insurer, therefore, must cover all the insured's damages stemming from a "continuous" triggering event, even if other insurance applies. *Goodyear Tire & Rubber Co. v. Aetna Cas. & Surety Co.*, 95 Ohio St.3d 512, 516 (2002).

That position overstates the case law's applicability in these circumstances. The policy in this case requires First Specialty to pay "those sums" above the primary insurance for which the insured is liable for as a result of a covered occurrence. In *Goodyear*, the language in the applicable

---

[7]

To the extent Manor Care argues the non-bolding of the term "occurrence" renders it ambiguous, that argument is unconvincing. A provision is ambiguous only if it is open to several possible meanings or interpretations. *Burris v. Grange Mut. Cos.*, 46 Ohio St.3d 84, 89 (1989). The existence of scrivener's error does not render a term ambiguous. *Carter v. Dickerson*, 1990 WL 118878, *1 (Ohio App. 1990). Moreover, parties may not rely on parol evidence, like course of performance evidence, to suggest a term is ambiguous. *Bay Coast Props., Inc. v. Natl. City Bank*, 2006 WL 1305110, *2 (Ohio App. 2006). Here, there is only one meaning for the term occurrence in the text of the policy. It is, accordingly, not ambiguous.

[8]

In addition, estoppel generally cannot extend the coverage of an insurance policy, as Manor Care wishes here. *Zecher v. All American Cas. Co.*, 116 Ohio App. 41, 45 (1961). Moreover, course of dealing/estoppel arguments generally have to do with late payment of premiums. *See, e.g., Schwer v. Benefit Ass'n of Railway Employees, Inc.*, 153 Ohio St. 312 (1950).

policy was "all sums," not "those sums." *Id.* Second, cases like *Goodyear* dealt with liability arising from exposure to asbestos or mass torts. *See, e.g., Goodyear*, 95 Ohio St.3d at 515; *Owens-Corning Fiberglas Corp. v. Amer. Centennial Ins. Co.*, 74 Ohio Misc. 2d 183, 212 (1995). Central to those decisions was the difficulty in parsing damages among different policy periods. *Id.* ("The issue of allocation arises in situations involving long-term injury or damage, such as environmental cleanup claims where it is difficult to determine which insurer must bear the loss."). Courts, in response to those extreme circumstances, have instructed the insurance companies first to pay the insured and then contest their individual share of that payment through contribution actions. *Id.*

Those circumstances, however, do not exist here. Where "it is relatively easy to determine who must bear the loss" reliance on *Goodyear* allocation is misplaced. *Indiana Ins. Co. v. Farmers Ins. of Columbus*, 2003 WL 22111115, *7 (Ohio App. 2003). Accordingly, this argument is not well-taken.

### 4. Apportionment of Settlement Damages

Many claims made by residents and their estates have settled. Many of these claims alleged multiple injuries occurring over multiple years. Because each separate alleged injury constitutes a separate "occurrence" under the policy, see § 3 *supra*, an issue exists as to how to apportion settlement damages among the parties.

This is somewhat of an unusual situation. Equitable apportionment generally applies to disputes between insurers. Generally, even where the insured is self-insured to some degree, if the insurer provides full coverage it may not seek contribution from, or apportion damages to, the insured. *Goodyear*, 95 Ohio St. 3d at 516.

Here, however, First Specialty has not provided full coverage - its policy only covers some of the claims Manor Care settled where the settlement disposed of claims arising from incidents occurring in years outside the First Specialty policy coverage period. At least one Ohio court has held that equitable apportionment is available in these circumstances. *The Hartford Ins. Group v. Commercial Union Assur. Cos*., 1979 WL 207144, *3 (Ohio App.). Courts in other jurisdictions have agreed. *Enserch Corp. v. Shand Morahan & Co.,* 952 F.2d 1485, 1494-95 (5th Cir. 1992); *Cooper Labs., Inc. v. Int'l Surplus Lines Ins. Co.*, 802 F.2d 667, 676 (3d Cir. 1986); *Employers Mut. Liab. Ins. Co. of Wisconsin v. Hendrix*, 199 F.2d 53, 59-60 (4th Cir. 1952). Accordingly, apportionment might be available here, and further briefing shall address the potential standards to guide such.[9]

### 5. Manor Care's Claim Handling Procedures

Endorsement No. 1 states that Manor Care provides an initial, self-insured, first layer of coverage. That document also, consequently, imposes certain duties on Manor Care to protect First Specialty, including "the same duty of care in defense and settlement that an insurer would owe [First Specialty] if the primary limits of liability were insured rather than self-insured." This includes a duty of good faith. *Centennial Ins. Co. v. Liberty Mut. Ins. Co.*, 62 Ohio St. 2d 221, 223 (1980).

First Specialty alleges Manor Care breached this duty during settlement negotiations and, in addition, did not keep it informed of settlement developments. For example, the defendant claims the plaintiff did not settle certain claims within the SIR that eventually were settled for much higher

---

[9]

A number of courts have noted how difficult apportionment can be, but several have suggested ways to proceed. *See Enserch*, 952 F.2d at 1495; *Amer. Home Assur. Co. v. Libbey-Owens-Ford Co.*, 786 F.2d 22, 30-31 (1st Cir. 1986).

awards within the excess coverage. There exist numerous fact issues with respect to this claim. Summary judgment is, accordingly, inappropriate as to their aspect of the parties' dispute.

### Conclusion

In light of the foregoing, it is, therefore,

ORDERED THAT:

1. First Specialty's motion for a declaration that only an "occurrence," as defined in the policy, triggers coverage shall be, and the same hereby is granted;

2. First Specialty's motion for a declaration that SIRs apply to insurance claims on a per "occurrence" basis, as defined in the policy, shall be, and the same hereby is granted as provided herein;

3. Manor Care's motion for a declaration that First Specialty is responsible for "all sums," as described in *Goodyear*, shall be, and the same hereby is denied;

4. First Specialty's motion for equitable allocation of settlement damages shall be, and the same hereby is held in abeyance pending further briefing; and

5. First Specialty's motion for summary judgment on plaintiff's breach of good faith with respect to claims handling procedures shall be, and the same hereby is denied.

6.  A status/scheduling conference is set for August 25, 2006 at 3:30 p.m.

So ordered.


s/James G. Carr
James G. Carr
Chief Judge