IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

MANOR CARE, INC.,

                             Plaintiff,                  Case No. 3:03 CV 7186

         -vs-
                                              <u>MEMORANDUM   OPINION</u>

FIRST SPECIALTY INSURANCE
CORPORATION,

                            Defendant.

KATZ, J.

      This matter is before the Court on Defendant First Speciality Insurance Corporation's ("First Specialty") motion for summary judgment (Doc. 118) and Defendant Intervenor United National Insurance Company's ("United") motion for summary judgment (Doc. 120).  This Court has jurisdiction pursuant to 28 U.S.C. § 1332.  For the reasons discussed below, First Speciality's motion for summary judgment is granted in part and denied in part, and United's Motion for summary judgment is granted.

**I. Background**

      This dispute arises out of Plaintiff Manor Care Inc.'s ("Manor Care") claim to proceeds from First Specialty for the sums expended by Manor Care to settle professional liability claims asserted against it by or on behalf of former residents of Manor Care nursing homes.  Specifically, the parties dispute whether First Speciality was obligated to, but did not, pay the sums required of it in sixteen separate cases that Manor Care argues were covered under their agreement with First Speciality.

      **A. Facts**

Manor Care owns and operates a nationwide network of assisted living facilities.  The instant case relates to Manor Care's insurance plan from June 1, 1999 to June 1, 2000, which covered professional incident liability in the operation of its facilities throughout the country.

Manor Care provided primary insurance in the form of a $500,000 per occurrence self-insured retention ("SIR").  If Manor Care's $500,000 per occurrence SIR was exhausted, an agreement between Manor Care and First Speciality provided that First Speciality would provide the first layer of excess insurance.  First Speciality Exhibit A.  The policy states that First Specialty will, subject to certain terms and exclusions, pay the excess sums that Manor Care "becomes obligated to pay as damages for liability imposed on [Manor Care] by law or assumed under an insured contract provided such damages are caused by an occurrence which takes place during [the] policy period because of personal injury. . ."[1]  *Id.* at 2.  First Speciality agreed to provide $25 million in coverage per occurrence, with an aggregate limit of $25 million.

United provided the second layer of excess insurance.  *See* Doc. 46; United Exhibit 1 at 1-3.  United and Manor Care agreed that if First Specialty's aggregate limit was exhausted, United would  provide $25 million in coverage per occurrence, with an aggregate limit of $25 million.

**B. Procedure**

On March 18, 2002, Manor Care filed a complaint against First Specialty in an Ohio state court alleging that First Speciality breached its contractual obligations.  Thereafter, First Speciality removed the case and it has been litigated in federal court for the past five years.  On

---

[1]

"Personal injury" is defined as "[b]odily injury, sickness, or disease sustained by a person, including death resulting from any of these" and "[p]hysical or mental disability and mental anguish when arising out of bodily injury."  First Specialty's Exhibit A at 21.

2

September 20, 2005, United entered the litigation when its motion to intervene was granted pursuant to Fed. R. Civ. P. 24. Doc. 45.

On July 17, 2006, after cross-motions for partial summary judgment, Chief Judge James G. Carr issued an opinion explaining the meaning of certain provisions of the professional liability agreement between Manor Care and First Speciality that were in dispute. *Manor Care, Inc. v. First Specialty Ins. Corp.*, 2006 WL 2010782 (N.D. Ohio, July 17, 2006); *see also Manor Care, Inc. v. First Specialty Ins. Corp.*, 2006 WL 2371999 (N.D. Ohio, August 14, 2006) (clarifying the effect of the July 17, 2006 order on United's motion for summary judgment). On October 30, 2006, Judge Carr denied Manor Care's motion for certification of an interlocutory appeal of the July 17, 2006 decision pursuant to 28 U.S.C. § 1292(b) or Fed. R. Civ. P. 54(b). *Manor Care, Inc. v. First Specialty Ins. Corp.*, 2006 WL 3097193, *1 (N.D. Ohio October 30, 2006). On April 1, 2008, the case was reassigned to this Court. Doc. 110.

**C. Judge Carr's July 17, 2006 order**

Judge Carr's July 17, 2006 order interpreted key provisions in the agreement between Manor Care and First Speciality. These include: (1) what constitutes a triggering event under the policy; (2) whether multiple SIRs may apply to a single lawsuit; (3) the extent of First Speciality's exposure once a triggering event occurs; and (4) how multiple injuries occurring during and outside of the covered period might be apportioned. *See Manor Care*, 2006 WL 2010782.

First, the court addressed what constitutes a triggering event. First Speciality becomes obligated to pay a sum in excess of Manor Care's SIR when an "occurrence" takes place. The policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same harmful conditions, which results during the policy period in personal

injury or property damage."  Thus, the court concluded, that "both the relevant conduct, and the injury for which the insured seeks coverage, must occur during the policy period." *Id.* at *2.

Second, the court considered whether multiple SIRs may apply to a single lawsuit.  The court explained that the policy imposes a $500,000 SIR before excess coverage applies and that the SIR applies to "$500,000 each occurrence." *Id.* at *4.  As a result, the court concluded that multiple SIRs may apply to a single lawsuit.[2]  The court reasoned that this reading of "occurrence" is consistent with both the policy and interpretation by Ohio courts. *Id.*; s*ee e.g. Progressive Preferred Ins. Co. v. Derby*, 2001 WL 672177, *3 (Ohio App.).  The court explained that "[w]here there are multiple proximate causes, each is a separate occurrence under an insurance contract." 2006 WL 2010782 at *4 (citing *Mich. Chem. Corp. v. Amer. Home Assur. Co.*, 728 F.2d 374, 378-83 (6th Cir. 1984)).

Third, the court considered whether First Speciality was ever obligated to cover all of Manor Care's damages stemming from a continuous triggering event, even during periods when other liability insurance applies.  The court concluded that First Speciality is not responsible for "all sums" incurred for any occurrence triggering its policy. *Id.* at *5.  The policy here at issue requires First Specialty to pay "those" sums above the primary insurance for which Manor Care is liable for as a result of a covered occurrence. *Id.*  Thus, the policy only extends to sums paid to settle claims arising out of conduct during the policy period that resulted in injury during the policy period.

---

[2]

This means that, for example, if Manor Care settles a case with a resident who alleged malpractice with four separate injuries each causing $1 million in damage, a separate SIR would apply to each injury alleged in the lawsuit and Manor Care would pay $2 million to the resident and First Specialty would pay the remaining $2 million. *See Manor Care, Inc.,* 2006 WL 2010782 at 1 n.4.

4

Fourth, the court addressed the issue as to how, if it becomes necessary, to apportion settlement damages among the parties.

> This is somewhat of an unusual situation. Equitable apportionment generally applies to disputes between insurers. Generally, even where the insured is self-insured to some degree, if the insurer provides full coverage it may not seek contribution from, or apportion damages to, the insured. [*Goodyear Tire & Rubber Co. v. Aetna Cas. & Surety Co.*, 95 Ohio St.3d 512, 516, 769 N.E.2d 835 (2002)].
> Here, however, First Specialty has not provided full coverage-its policy only covers some of the claims Manor Care settled where the settlement disposed of claims arising from incidents occurring in years outside the First Specialty policy coverage period. At least one Ohio court has held that equitable apportionment is available in these circumstances. *The Hartford Ins. Group v. Commercial Union Assur. Cos.*, 1979 WL 207144, *3 (Ohio App.). Courts in other jurisdictions have agreed. *Enserch Corp. v. Shand Morahan & Co.*, 952 F.2d 1485, 1494-95 (5th Cir.1992); *Cooper Labs., Inc. v. Int'l Surplus Lines Ins. Co.*, 802 F.2d 667, 676 (3d Cir.1986); *Employers Mut. Liab. Ins. Co. of Wisconsin v. Hendrix*, 199 F.2d 53, 59-60 (4th Cir.1952). Accordingly, apportionment might be available here, and further briefing shall address the potential standards to guide such.

*Id.* at *5.

The July 17, 2006 ruling made no conclusions on the issue of liability. At the time of the decision, the underlying cases that Manor Care sought proceeds for presented issues of material fact regarding whether Manor Care's injuries were the result of a single proximate cause or multiple ones. *Manor Care*, 2006 WL 2371999 at *1.

Subsequent to the issuance of that order, Judge Carr ordered Manor Care to provide a statement of its trial position as to each of the underlying claims that Manor Care believes First Speciality is obligated to make payment on. Doc. 98. The court ordered Manor Care to include a detailed account of each occurrence as well as "a list of exhibits that it intends to introduce in support of its case at the trial of this action," and for First Specialty to do the same. This opinion addresses the impact of the July 17, 2006 rulings on each of the sixteen underlying cases.

**II. Standard of Review**

5

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323-25.  Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting FED. R. CIV. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations.  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324; *see also Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000).  Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams*

*v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)).  However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact." *Williams*, 154 F. Supp. 2d at 1071.  The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999).  Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

## III. Discussion

In its motion for summary judgment, First Specialty makes two primary arguments to explain why it is not obligated to make payments to Manor Care.  In a portion of the underlying cases, First Speciality argues that evidence demonstrates that there was no incident that resulted in "personal injury" during the First Speciality policy period and that no reasonable fact finder could conclude otherwise.  In the remaining cases, First Speciality argues that although Manor Care can demonstrate an "occurrence" within the First Speciality policy period, the value of any injury is within Manor Care's $500,000 SIR and does not reach the excess insurance provided by First Speciality.

With support from its expert witness,[3] Manor Care addresses First Speciality's arguments and claims that genuine issues of material fact exist.  First, Manor Care argues that there is substantial evidence establishing "personal injury" during the covered period because of the continuous deterioration throughout each resident's residency that is not attributable to a specific time, but rather that constitutes "bodily injury, sickness, or disease" under the definition of "occurrence."  Second, Manor Care argues that due to repeated exposure to the same harmful conditions, each underlying case presents only one "occurrence," requiring the application of only one SIR.  Lastly, Manor Care argues that questions of material fact exist regarding the percentage of the settlement that should be allocated to First Speciality in cases where multiple injures occurred both inside and outside the covered period.

Before addressing the underlying cases, it is important to respond to Manor Care's arguments.  The provisions of the agreement between First Speciality and Manor Care require that both the relevant conduct and the injury for which the insured seeks coverage take place during the policy period.  As a result, Manor Care's "continuous negligence" claims are viable only if the evidence shows that "an accident, including continuous or repeated exposure to the same substantially harmful conditions" took place during the policy period and resulted in personal injury during the policy period.  *See* First Speciality Exhibit A at 20.  The policy defines personal injury to include bodily injury, sickness, or disease, in addition to physical or mental disability and anguish when arising out of bodily injury.  First Specialty's Exhibit A at 21.

---

[3]

Manor Care relies on the opinion of James F. Nooney, a licenced attorney since 1966 and member of Eastman & Smith LTD.  *See* Manor Care Exhibit 1.

This Court now turns to its analysis of the sixteen disputed cases.  To sustain its burden, First Speciality must show that either: (1) the amount Manor Care paid in settlement is not attributable to the kind of claim covered by the professional liability agreement, (2) even if the claim would have been covered, the "occurrence" did not take place within the June 1, 1999 to June 1, 2000 covered period, meaning that either the relevant conduct or the injury did not occur during the covered period, or (3) although an occurrence did take place during the policy period, Manor Care's $500,000 per occurrence SIR can be applied thus extinguishing First Speciality's responsibility to provide excess insurance.  If and when First Speciality meets this burden, Manor Care carries the burden of showing that, when construed in a light most favorable to Manor Care, there exist genuine issues of material fact better left for trial.

### A. Resident One[4]

During the litigation of this case, Resident One's attorney submitted a settlement demand that explains and itemizes the injuries supporting Resident One's demand.  First Specialty Exhibit D.  That document begins by explaining that the suit "is driven by the occurrence of massive Stage IV pressure sores."  *Id* at 1.  Addressing these pressure sores, the settlement demand provides a four and a half page table of "In-House Pressure Sore Development and Neglect."  *Id*. at 3-7.  The table contains a long list of the alleged negligent acts that began on March 20, 2001 and resulted in pressure sores.  This was more than nine months after the expiration of the professional liability agreements.

---

[4] To protect the residents' privacy, identities, and medical records, this Court shall refer to the residents in the same order as First Speciality's memorandum in support of its motion for summary judgment.  Manor Care's memorandum in opposition to First Speciality's motion addresses the residents in almost the same order.  *See* Doc. 118 at 6-24 (under seal); Doc 121 at 16-26 (under seal).

9

Pressure sores were the main, but not the only source of Resident One's suit.  Resident One's attorney alleged that Manor Care was negligent regarding Resident One's nutrition, resulting in weight loss between April 17, 2001 and July 5, 2001, more than eleven months after the expiration of the policies at issue.  Resident One's attorney also alleged that Manor Care was indifferent to Resident One's pain and suffering between April 25, 2001 and July 11, 2001, but the record does not contain any information establishing that this took place during the covered period.  Finally, the alleged falsification of medical records occurred in 2001, outside the covered period.

Manor Care argues that there is substantial evidence that there was "personal injury" during the First Speciality policy period constituting a single "occurrence" to which one SIR may be applied.  However, the injuries here all occurred after the expiration of the First Speciality policy.  Even if continuous neglect took place, the record does not demonstrate that it occurred during the covered period and resulted in Resident One's personal injuries during the covered period.  First Speciality's motion is granted with regard to Resident One.

**B. Resident Two**

On December 13, 2004, Resident Two's attorney submitted a settlement demand that explains and itemizes the injuries supporting Resident Two's demand.  First Speciality Exhibit E. The settlement demand alleges "systematic neglect and indifference" and sets forth the events that gave rise to Resident Two's claims.  *Id.* at 2.

All of Resident Two's personal injuries occurred after the covered period.  Between October 2, 2000 and November 7, 2000, Resident Two alleged that Manor Care failed to assess his skin and treat his wounds.  During that time, Resident Two developed at least eight in-house pressure sores.  Starting October 2, 2000, Resident Two alleged that Manor Care employees

10

routinely violated physician orders to treat his pressure sores. Between November 7, 2000 and May 25, 2001, Resident Two's attorney wrote that "medical records establish that . . . [Resident Two] . . . was forced to endure pain." S*ee id.* at 26. During that time, physician orders for pain medication were allegedly not followed.[5] Between November 7, 2000 and January 30, 2001, Resident Two claimed to have suffered from dehydration. Between October 12, 2000 and February 1, 2001, Resident Two claimed to have significant weight loss and severe depletion of visceral protein sores. Resident Two claimed that his medical records were falsified in 2001.

Manor Care argues that there is substantial evidence that Resident Two experienced "personal injury" during the First Speciality policy period constituting a single "occurrence" to which a single SIR applies. However, the record reveals no instance in which the relevant conduct and the personal injury occurred during the policy period. First Speciality's motion is granted with regard to Resident Two.

### C. Resident Three

In 2003, a comprehensive report for this case was prepared by the attorney defending the Manor Care facility against Resident Three's claims. First Speciality Exhibit F. The report explained that the case stems from allegations of: (1) improper admittance into Manor Care's facility; (2) incomplete medical records; (3) weight loss; (4) uncontrolled diabetes; (5) urinary

---

[5]

To Manor Care's credit, two out of thirty one instances in which Resident Two alleged that Manor Care neglected his pain occurred during the covered period. First Speciality Exhibit E at 31. These instances include allegations that Manor Care failed to complete a pain assessment form and that there was not a care plan created for dealing with Resident Two's pain. *Id.* However, Resident Two was not reported to have experienced any pain at those instances or at any time during the covered period. It was not until November 7, 2000 that Resident Two was reported to have actually felt pain. The remaining twenty-nine instances occurred outside of the policy period and include numerous allegations of neglect towards Resident Two's actual pain. *Id.* at 29-32.

tract infections; (6) malnutrition; (7) falls with injuries; (8) development of scabies; (9) development of sepsis; and (10) development of a staph infection. *Id.* at 2. First Speciality argues that none of the injuries that were the subject the ensuing lawsuit took place within the June 1, 1999 to June 1, 2000 covered period.

The facts attributable to Resident Three's claims, including: (1) the fall that took place on June 14, 2000 resulting in a fractured hip; (2) the facility's failure to transfer Resident Three due to its inability to care for the resident several times throughout her stay; (3) the failure to follow dosage instructions; (4) inadequate pain medication given to Resident Three towards the end of her residency in 2001; and (5) Resident Three's scabies in September, 2000. Other events giving rise to Resident Three's claims included lost weight beginning in November, 2000 and gangrene in her toe in August, 2000. She was a diabetic from the time she was admitted and experienced unusual blood sugar levels throughout her residency.

In sum, during the covered period, Resident Three experienced some blood sugar irregularities and the facility may not have been equipt to handle all of her medical needs. However, both of these problems occurred to an even greater extent outside of the policy period.

This case was settled for $725,000. To the extent that Resident Three was injured during the covered period, the value of such an occurrence does not exceed one SIR considering the numerous documented injuries sustained after the covered period and the amount that the case was settled for. First Speciality's motion is granted with regard to Resident Three.

### D. Resident Four

In 2005, an assessment of this case was prepared by the attorney defending the Manor Care facility against Resident Four's claims. First Speciality Exhibit I at 1. The assessment explained that the case stems from allegations of: (1) a fall with injuries; (2) pneumonia; (3)

12

conjunctivitis; (4) significant weight loss; (5) pressure sores/decubitus ulcers and gangrene on his right toe and leg; and (6) urinary tract infection.

None of Resident Four's injuries took place during the covered period. Resident Four sustained a fall in June, 1991. He experienced pneumonia in July, 1998. Resident Four experienced conjunctivitis from August to September, 1998. He had no skin problems noted on August 23, 2001, but days later gangrene began to spread on Resident Four's right foot. This also marks the point when pressure sores and decubitus ulcers developed. There was also a question as to whether he had a urinary tract infection at this time.

First Speciality argues that these alleged claims were not "occurrences" that took place within the June 1, 1999 to June 1, 2000 covered period. Manor Care responds that due to the systematic failures of the facility, Resident Four's injuries constitute a single occurrence to which one SIR applies. While the record shows that the nursing staff sometimes failed to properly document Resident Four's progress, the dates of such failures are outside of the covered period, as are any personal injuries that may have been the result of such neglect.

Viewing the facts in a favorable light to Manor Care, even if the Court accepts Manor Care's claim that ongoing neglect was happening at the facility, the record does not reflect that incidents occurred during the covered period that caused Resident Four's personal injuries during the covered period. First Speciality's motion is granted with regard to Resident Four.

**E. Resident Five**

In 2005, a report about this case was prepared by the attorney defending the Manor Care facility against Resident Five's claims. First Speciality Exhibit J at 1. The report offers detailed information about Resident Five's stay at a Manor Care facility. As an introduction, the report states that "the 1997 through mid-2002 years of [Resident Five's] residency were fairly uneventful

13

. . . [s]he suffered from a couple of [urinary tract infections], intermittent chest pain, and there were some chronic blister issues in the area where her diapers met throughout this time period, some Stage II wounds on her buttocks in 1999, and on her thigh again in November of 2001 and September of 2002.  All of these areas were treated and healed." *Id.* at 3.

Some of Resident Five's medical problems occurred around the time of the covered period.  These incidents may have given rise to Resident Five's suit: (1) negligent treatment of ulcers; (2) falls; (3) dehydration; (4) diabetes mismanagement; (5) dietary mismanagement; (6) nutritional issues; (7) failure to follow orders; and (8) poor charting.

Regarding the development and treatment of ulcers, the record before this court indicates that no blisters were present before November, 2000 and the ones found in November, 2000 were healed by April, 2001.  Resident Five fell twice with no injury during the covered period and the record only indicates one "problematic fall [that] occurred on June 11, 2002" which Manor Care did not appear to follow up on.  *Id.* at 9.  In terms of dehydration, "in early August 2002 [Resident Five] was noted to have an elevated [blood urea nitrogen level]" and "on February 14, 2003, she was noted to be dehydrated with malnutrition."  In terms of her diabetes, although Resident Five's diabetes was an issue from the time she was admitted to the facility, in April, 2002 insulin was stopped for "an unknown reason."  *Id.* at 10.  Regarding dietary mismanagement, Resident Five was not examined by a dietitian during the covered period, but in August 2001 a full nutritional risk assessment demonstrated that her diet was sufficient to meet her needs.  Regarding failures of the facility to follow orders, such failures were alleged to have occurred in 1998 (nutritional orders not followed), 2001 (failure to obtain ordered labs), and 2002 (failure to complete labs).  *Id.* at 10-11.  There were also problems with "holes/gaps" in charting in 2001 and 2002.

14

According to the report, the focus of Resident Five's case was "the skin breakdown and related issues in late 2002 and early 2003." *Id.* at 2.  In particular, Resident Five's decline "became more marked following the development of a wound on her left ankle" that was first documented November 10, 2002.  *Id.* at 3.  Around this time, Resident Five experienced the following: pneumonia, decubitus ulcer, an open wound, chronic renal failure, gastritis, urinary tract infection, dementia, senility, and a stage III and stage IV statis ulcer.  *Id.* at 3-4.

The report indicates that the facility's level of care for Resident Five declined after the policy period.  The report is replete with examples of this and the Court offers one.  In November, 2000, when the medical staff at the facility learned about Resident Five's blisters, the medical staff ordered the appropriate medication and monitored it until it was noted to be healed in April, 2001.  First Speciality Exhibit J at 5.  However, in September, 2002 the record indicates that when blistering occurred again, there was no documented notification of the physician, family, or dietician, and that the order for medication was not signed by the physician.  *Id.*

This case was settled for $700,000.  Viewing the facts in a favorable light to Manor Care, the record does not reveal incidents that occurred during the covered period that caused personal injury during the covered period that could approach the applicable $500,000 per occurrence SIR. To the extent that personal injuries occurred during the policy period, they are minimal compared to injuries outside of the covered period and reasonable minds cannot attribute more than $500,000 out of $700,000 to the injuries during the covered period.  First Speciality's motion is granted with regard to Resident Five.

**F. Resident Six**

In 2002, the attorney defending the Manor Care facility against Resident Six's claims compiled a "comprehensive evaluation status report."  First Speciality Exhibit K at 1.  Defense

15

counsel stated that the main issues in this case concern: (1) falls; (2) four decubitus ulcers; (3) a urinary tract infection; and (4) bowel obstruction.  *Id.* at 2.

Manor Care argues that the focus of Resident Six's claim was the lack of an adequate care plan and staffing which contributed to Resident Six's deterioration and death.  However, Manor Care has failed to identify conduct during the covered period that resulted in an injury that took place within First Speciality's policy period.  The four decubitus ulcers occurred in May, 1999. Failures that occurred before and not after May, 1999 are what led to the presence of these injuries.  *Id.* at 2. On March 28, 2001, Resident Six fell out of her wheelchair causing a hematoma to the back of her head.  *Id.* at 3.  When she was hospitalized for this fall, Resident Six experienced a urinary tract infection and bowel obstruction.  After her April 4, 2001 surgery to relieve the bowel obstruction, Resident Six became less responsive and died on April 18, 2001 of "natural" cause.  *Id.* at 3.

The report written by the Manor Care facility's attorney explains that the facility in which Resident Six stayed "enjoys a good reputation, is well run, and is also respected in the community."  *Id.* at 4.  Although there was a temporary period when the facility was on moratorium after the American Health Care Association conducted a survey in 1998, shortly thereafter "the staff worked very hard to resolve these issues and brought the facility back into compliance."  *Id.* at 8.

Viewing the facts in a favorable light to Manor Care, the record does not reflect any conduct that took place during the covered period that caused Resident Six's personal injuries during the covered period.  First Speciality's motion is granted with regard to Resident Six.

**G. Resident Seven**

In 2002, the attorney defending the Manor Care facility against Resident Seven's claims wrote a case status report concerning this case.  First Specialty Exhibit L.  Days after her arrival, Manor Care learned that Resident Seven was mildly debilitated due to a lack of activity and was not eating enough.  *Id.* at 2.  In response, a facility therapist set a goal to allow Resident Seven to walk 150 feet without assistance, and the staff established an elaborate system to help Resident Seven voluntarily eat.  *Id.*

 "The most significant problems occurred after June 1, 2000."  First Speciality Exhibit H at 2.  After this, potentially preventable decubitus ulcers formed primarily on Resident Seven's buttock, legs, and heels.  First Speciality Exhibit L at 3-4.  Also, the facility failed to provide Resident Seven with mittens to prevent her from scratching these areas which caused them to worsen.  It was not until February, 2001 that Resident Seven was admitted to the hospital primarily for cardiovascular reasons but also due to malnutrition, bedsores, and dehydration.

Manor Care argues that the principle allegations against the facility relate not to a specific incident, but instead to systematic negligence.  However, there is nothing in the record that demonstrates that any conduct that took place during the covered period caused Resident Seven's personal injuries during the covered period.  First Speciality's motion is granted with regard to Resident Seven.

### H. Resident Eight

In the case of Resident Eight, personal injuries occurred during and after First Speciality's policy period.  Resident Eight lived at a Manor Care facility from November 4, 1999 until November 25, 2000.  The attorney defending the Manor Care facility from Resident Eight's claims believed that the main focus of Resident Eight's case was the development of wounds on Resident Eight's foot.  First Speciality Exhibit M at 2.

17

The record indicates that Resident Eight suffered the following injuries during the covered period: (1) a rash appeared on Resident Eight's buttocks in December, 1999 for which anti-itching medicines were given rather than something to treat the underlying cause of the rash which continued to worsen; (2) a deep skin tear on the right lower leg discovered in January, 2000 was inappropriately treated with a band-aid; and (3) a fall causing a skin tear on Resident Eight's right shin on April 29, 2000.  First Speciality Exhibit N.

The following is reported to have occurred after the policy period: (1) Resident Eight developed a wound on her foot in August, 2000 to which the facility inappropriately responded to; (2) Resident Eight experienced intermittent claudication; (3) the rash on her buttocks from December, 1999 worsened; (4) additional foot and toe wounds appeared and existing wounds worsened, and on November 20, 2000 Resident Eight had gangrene of toes on her right foot that had a staph infection; and (5) by November 24, 2000 Resident Eight had mottling of all four extremities.  *Id.*

This case was settled for a total of $925,000.  First Speciality argues that, compared to the value of the injuries after the covered period, the value of the injuries during the covered period are minimal and do not exceed Manor Care's $500,000 SIR.  Manor Care argues that a reasonable mind could conclude the opposite.  Manor Care supports this argument with its expert's evaluation which concludes that the principle allegations in the case involve the continuous inadequacy of the facility, including the failure to develop, implement, and update an adequate resident care plan, and the failure to maintain records and properly supervise staff.

Here, viewing the evidence in favor of Manor Care, the evidence does not reflect that Resident Eight's injuries were not caused by ongoing neglect that could be interpreted as one "occurrence."  This is due to both the relative closeness in time of the injuries as well as the

18

description of the injuries as being caused by a similar kind of carelessness.  As a result, a question of material fact exists regarding whether the same kind of ongoing negligence during the covered period caused the injuries during the covered period, and thus how many SIRs apply.  Also, in this case the Court cannot make calculations regarding the proportional value of the injuries that occurred during the covered period.  These will be the subjects at trial.  First Speciality's motion with regard to Resident Eight is denied.

### I. Resident Nine

Resident Nine began her residency at a Manor Care facility on October 13, 1995.  First Speciality Exhibit O at 1.  Her claim against Manor Care stems from injuries that occurred during and after First Speciality's policy period.  During the policy period, Resident Nine developed a pressure sore in the middle of the buttocks which eventfully led to her transfer to a hospital for specialized care.  There is a question about whether this sore ever healed.  The record indicates that it "would never heal," but the record also says that the sore "healed on June 19, 2000." *Id.*

After the policy period, a stage II ulcer was noted on Resident Nine's left hip in addition to a coccyx ulcer.  Although it was reportedly healed, the left hip reopened and became a stage II-IV ulcer with necrotic center, 100% yellow slough, marked sero-sanguinous drainage, a foul order, and it was infected.  Resident Nine was then transferred to a hospital where her wounds were aggressively treated but improved very little.

In her lawsuit against the Manor Care facility, Resident Nine alleged that Manor Care violated "laws on a routine basis and engaged in a pattern and practice of ongoing neglect and conduct prohibited by law, which included failure to provide sufficient staff, monitor, observe and assess, hire and train appropriate personnel . . . [and] render proper treatment for pressure sores." *Id.*  The record indicates that, throughout Resident Nine's stay, there were inconsistencies and

gaps in charting, failure of the staff to document the treatment they provided, and written complaints about the care provided to Resident Nine. *Id.* at 2.

This case was settled for $2,000,000.  First Speciality argues that, compared to the value of the injuries after the covered period, the value of one pressure sore during the covered period does not exceed Manor Care's $500,000 SIR.  Manor Care argues that Resident Nine experienced more harm than a single pressure sore.  Manor Care supports this argument with its expert's evaluation, which concludes that Resident Nine alleged systematic deficiencies with the facility and routine violations of law.

Here, neither party would disagree that only one SIR applies in this case.  From First Speciality's perspective, this is because Resident Nine only sustained one injury during the covered period.  From Manor Care's perspective, it is because the same ongoing negligence caused all of Resident Nine's injuries.  Nonetheless, the Court is now asked to decide whether one injury during the covered period is enough to exceed Manor Care's $500,000 SIR in light of the few other injures after the covered period and the $2,000,000 settlement.  The Court will not make such a judgment.  This will be the subject at trial.  First Speciality's motion with regard to Resident Nine is denied.

**J. Resident Ten**

In 2002, the attorney defending the Manor Care facility against Resident Ten's claims created a summary and analysis of this case.  First Speciality Exhibit P.  According to this report, the "crux" of Resident Ten's case was (1) pressure ulcers; (2) falls; (3) malnutrition; (4) urinary tract infection; and (4) pneumonia.  *Id.* at 4.  Some of these medical problems occurred during the First Speciality policy period and others occurred after the policy period.

20

Regarding the pressure ulcers, Resident Ten came to the facility with pressure ulcers that were treated during the covered period.  *Id.* at 5, 10.  However, after the policy period, on July 25, 2000, a pressure ulcer had developed to a stage II decubitus ulcer on his sacral area.  *Id.* at 18. Regarding the falls,  Resident Ten's first fall was on July 14, 2000, shortly after the covered period and at least five more falls followed.  Regarding Resident Ten's nutrition, he was only documented to have lost one pound before June 13, 2000, but he lost nine pounds by September 6, 2000.  Regarding pneumonia, Resident Ten was diagnosed with pneumonia during the policy period, on May, 28, 2000, which worsened before it improved in mid-June, 2000.  At least one incident of pneumonia occurred after the covered period.  By September, 2000, Resident Ten was considered terminally ill and died in a hospice.

In sum, the only injury that Resident Ten sustained during the covered period was one bout of pneumonia that was treated and healed.

This case was settled for $750,000.  First Speciality argues that reasonable minds can only conclude that the value of the injuries Resident Ten incurred during the covered period cannot exceed Manor Care's $500,000 SIR.  The evidence supports this argument.  This is unlike the case of Resident Nine where the resident faced one out of relatively few injuries during the covered period  that may not have healed and whose case was settled for $2,000,000.  Here, the value of a single incident of pneumonia that healed cannot have exceeded the $500,000 SIR and no reasonable trier of fact would so find in light of the overwhelming amount of injuries after the covered period and the $750,000 total settlement.  As explained in the July 17, 2006 order, First Speciality is not responsible for "all sums" incurred for any occurrence triggering its policy, but rather "those sums" above the $500,000 SIR paid to settle claims arising out of conduct during the

21

policy period that resulted in injury during the policy period.  First Speciality's motion is granted with regard to Resident Ten.

### K. Resident Eleven

Resident Eleven was a resident at Manor Care from August 3, 1999 until  December 20, 2002.  The attorney who defended Manor Care against Resident Eleven's claims prepared an extensive report on this case.  First Speciality Exhibit Q.  According to this report, Resident Eleven's "most serious allegations against [Manor Care] focus on the 57 falls sustained" and "the staff's alleged failure to properly treat [Resident Eleven's] critically high level of potassium." *Id.* at 2.  Few of these incidents occurred during First Speciality's policy period, and the vast majority occurred after the policy period.

Two incidents occurred during the policy period: (1) a fall on October 15, 1999, which resulted in a laceration to Resident Eleven's forehead, and (2) an episode of mild hyperkalemia on January 22, 2000, which was normal shortly thereafter and did not recur for another year.  *Id.* at 2, 5.  After the covered period, Resident Eleven suffered three more abnormal potassium problems and fell fifty-six more times.

Three abnormal potassium problems occurred were documented after the covered period. On January 24, 2001 Resident Eleven had a mild case of hyperkalemia, but her potassium level was not re-checked for more than six moths.  On November 14, 2002 she had another episode of mild hyperkalemia but nothing on record showed that the physician was notified or that changes were made to the plan of care.  On December 20, 2002, Resident Eleven's potassium levels reached a critical value at which death can occur any moment due to a cardiac arrhythmia.  The Manor Care facility's attorney reported that all three of these incidents violated the standard of

care, which was not mentioned in relation to the hyperkalemia that happened during the covered period.

Resident Eleven fell fifty-six times after the covered period. A sample of the injuries she sustained include skin tears, swelling, bruising, a black eye, lacerations on her nostril, a nose bleed, lacerations on the back of her head, scrapes on her knee, scratches on her hip, and a two inch laceration on the right side of her head. On December 20, 2007, Resident Eleven sustained her fifty-seventh fall requiring a hospital visit where she was diagnosed with five serious medical problems. Her family agreed to terminate life support on December 28, 2002 and Resident Eleven died a few days later.

This case was settled for $2,000,000. First Speciality argues that the single fall and the single episode of hyperkalemia that occurred during First Specialty's policy period are of little value compared to the fifty six falls and multiple episodes of hyperkalemia. In the face of evidence that shows that Resident Nine sustained fifty-six falls and three episodes of hyperkalemia after the covered period, no reasonable person could conclude that the single fall and single episode of hyperkalemia during the covered period are valued at more than two SIRs totaling even a single $500,000 SIR relative to the total settlement amount. First Speciality's motion is granted with regard to Resident Eleven.

### L. Resident Twelve

Resident Twelve was a resident of Manor Care for eight days, from May 26, 2000 until June 2, 2000. First Speciality Exhibit R. Resident Twelve was admitted to the Manor Care facility for treatment of a decubitus ulcer on her leg. On May 29, 2000, Resident Twelve's physician ordered lab tests. On May 31, 2000, the nursing home received a lab report indicating a high potassium level. One expert's opinion was that Manor Care's nurses should have known that

Resident Twelve faced renal failure on May 31, 2000 and thus to stop potassium supplements.[6]
However, the nurses continued administering potassium supplements on May 31, 2000 and on
June 2, 2000.  When Resident Twelve complained of pain on June 2, 2000, instead of calling a
doctor the nurses administered Darvocet pain medication.  Four hours later, Resident Twelve was
found without a pulse or respirations.  She was revived but later expired at a nearby hospital.

 Resident Twelve alleged negligence, negligence per se, and gross negligence.  She also
alleged inadequate hiring, supervision, fiscal management, and equipment maintenance.
Regarding the specific care she received, Resident Twelve alleged failure to: notify the physician
of hyperkalemia, develop a comprehensive care plan, monitor pain status, timely transfer to a
higher level of care, provide an adequate means of communication, monitor proper administration
of medicines, recognize acute changes in physical status, and monitor daily vital signs, dietary
status, wound assessments, and intake and output.

 This case was settled for $1,350,000.  First Speciality argues that the events that occurred
on June 2, 2000 and Manor Care's subsequent failures to cooperate with the investigation in this
case are what predominated Resident Twelve's claims.  *See* First Speciality Exhibit S.  Manor
Care responds that, except for one fracture, all individual incidents that gave rise to Resident
Twelve's claims were symptomatic of systematic deficiencies alleged against the facility
amounting to one "occurrence" and the application of a single SIR.

 Here, an issue of material fact exists regarding whether this case presents an "occurrence"
during the covered period triggering Manor Care's right to proceeds.  This rests on the question as

---

[6]  The report also indicates that the standard of care was compromised on May 31, 2000
when there was a failure to inform the physician of changes in conditions due to the lab results.
First Speciality Exhibit R at 4-5.

to whether Resident Twelve sustained a "personal injury" during the covered period, specifically on May 31, 2000.  A question also exists as to whether the injuries sustained by the resident arise out of isolated occurrences or the same ongoing negligence that amounts to a single occurrence. This will determine how many SIRs apply to this case.  These questions will be the subjects at trial.  First Speciality's motion is denied with regard to Resident Twelve.

### M. Resident Thirteen

The attorney defending the Manor Care facility against Resident Thirteen's claims prepared a "comprehensive evaluation status report" regarding this case. First Speciality Exhibit T.  Resident Thirteen alleged that her physical and emotional injuries occurred as a result of Manor Care's actions and omissions that caused: falls resulting in injuries, skin infections, unexplained injuries, poor hygiene, inappropriately treated physical and mental problems, unsafe environment, delays in care, inadequate preventative skin care, and inconsistent documentation. Resident Thirteen sustained injuries before, during, and after the covered period.

Several incidents occurred before the covered period.  Between 1993 and 1998, Resident Thirteen fell about thirteen times.  *Id.* at 2-4.  Resident Thirteen's mental problems occurred before the covered period.  *Id.* at 6-7.  Resident Thirteen also sustained several skin tears and breakdowns between 1994 and 1999.  *Id.* at 7-8.  The First Specialty policy does not apply to any of these injuries.

During the covered period, on February 15, 2000, Resident Thirteen slipped out of her wheelchair and hit her head resulting in a large bruise to her forehead with an open cut.[7]  Two

---

[7]    The report indicates that Resident Thirteen was wearing a seat buckle during this injury and that "the nursing staff was doing their jobs, ensuring that her restraints were in place."

days later, Resident Thirteen returned to the facility with seizure precautions in place and on

March 8, 2000 she had a thirty second seizure.  Also during the covered period, Resident Thirteen

experienced skin tears and breakdowns including a skin tear on her hand, pustules on her buttocks,

and several skin tears and bruises.  She also lost weight in the first few months of 2000.

After the covered period, on June 28, 2001, Resident Thirteen's daughters noticed that

Resident Thirteen's lower legs were sensitive to pain and it was not until July 2, 2001 that she was

admitted to a hospital and an x-ray revealed a right femur fracture.  In February, 2001, Resident

Thirteen had a grand mal seizure.  She also had several skin tears and breakdowns including open

areas on her buttocks and a fungal rash.  She also had at least one urinary tract infection.

This case was settled for $1,200,000.  First Speciality argues that the only injury of any

magnitude was the July, 2001 fracture and the delay by Manor Care in seeking treatment for the

injury.  As a result, the relative value of the February, 2000 fall would be within Manor Care's

$500,000 per occurrence SIR.  Manor Care responds that First Speciality ignores evidence of

other harm such as the skin problems that Resident Thirteen sustained.

Multiple SIRs may apply to a single lawsuit, and First Speciality's policy only extends to

sums paid to settle claims arising out of conduct during the policy period that resulted in personal

injury during the policy period.  Here, separate SIRs apply to the occurrences during the covered

period because there is no evidence suggesting that the injuries that took place during the covered

period were the result of ongoing negligence that amounts to only one "occurrence" to which a

single SIR would apply.  The report before this court indicates that, overall, the nursing home

"properly treated [Resident Thirteen]." *Id.* at 11.  The report also indicates several areas in which

the nursing home provided prudent care during the covered period.  Applying separate SIRs to the occurrences in this case, First Specialty's excess insurance cannot be reached.  First Speciality's motion is granted with regard to Resident Thirteen.

### N. Resident Fourteen

In 2003, the attorney defending the Manor Care facility against Resident Fourteen's claims complied a detailed report with the factual background of this case.  First Specialty Exhibit U.  The Manor Care facility's attorney believed that an arm fracture, skin tears, and fecal impaction were most the critical injuries.

Resident Fourteen sustained some personal injuries during the covered period.  On January 9, 2000 a nurse found Resident Fourteen on the floor with a skin tear to the right shin.  On April 23, 3000, x-rays revealed a fracture of the surgical neck and the staff at Manor Care's facility was unsure when the fracture occurred.  A report on June 6, 2000 suggested that the fracture was healing with no problem.

Resident Fourteen also had injuries after the covered period.  For example, he had an eye infection and for approximately four months and from October 3, 2000 to February 1, 2001 treatment was being administered to the wrong eye. In July, 2000, Resident Fourteen had serious dietary problems.  Two months later a podiatry consult revealed discolored nails, onycholysis, subungual debreis, nail hypertophy, and onychauxis.  On February 1 and 2, 2001, Resident Fourteen had liquid bowel movements indicative of fecal impaction but no action was taken by Manor Care.  By February 11, 2001, Resident Fourteen was vomiting regularly and fifteen days

later abdominal x-rays indicated fecal impaction and the resident had a large amount of dark brown emesis.

The case was settled for $1,395,000. First Speciality argues that the value of the occurrences within the policy period is less than Manor Care's $500,000 per occurrence SIR. Manor Care argues that First Speciality's argument ignores additional harm such as dehydration, contractures, utis, falls, fecal impaction, infections, ulcers, and weight loss.

Multiple SIRs may apply to a single lawsuit, and First Speciality's policy only extends to sums paid to settle claims arising out of conduct during the policy period that resulted in personal injury during the policy period. Here, like Resident Thirteen, the report before this Court indicates that the nursing home "properly treated [Resident Fourteen]" whose charts were "well documented." *Id.* at 9. Although the report then explains some situations in which a jury may believe that the nursing home's negligence was ongoing, almost all of these facts describe conduct that occurred outside of the covered period. Applying separate SIRs to the occurrences in this case, First Specialty's excess insurance cannot be reached. First Speciality's motion is granted with regard to Resident Fourteen.

### O. Resident Fifteen

A pretrial report prepared by the attorney representing the Manor Care facility describes this case to be "a decubitus death case involving a large, progressive ulcer." First Speciality Exhibit W at 2. The pretrial report explains that Resident Fifteen's attorney would have liked to "inflame the jury" by using the Manor Care facility's false and altered documentation as evidence.

28

Resident Fifteen was a resident at the Manor Care facility at two different times, once from April 17, 2000 to May 12, 2000, and once from May 31, 2000 to August 29, 2000.  At the time of his first admission, Resident Fifteen had a stage II decubitus ulcer on his coccyx and an ulcer on his left wrist. *Id.* at 11.  While at the Manor Care facility, he developed an ulcer on his left heel. For two weeks, beginning May 12, 2000, Resident Fifteen stayed at a different nursing home.  On May 31, 2000, the last day of the First Specialty policy period, Resident Fifteen was readmitted to the Manor Care facility. At the time of readmission, Resident Fifteen had a stage IV ulcer on his coccyx with tunneling at four points and ulcers in various other locations in addition to a stage II ulcer on his shoulder.

On June 1, 2000, a doctor noted that the ulcers on Resident Fifteen's coccyx and wrist had a bad smell.  His white blood cell count also continued to be high.  On June 20, 2000, after the covered period, cultures were taken of the stage IV ulcer and on August 20, 2000 despite antibiotics, the area was draining a foul-smelling substance.  Nine days later, Resident Fifteen was discharged to the hospital with low blood pressure and an irregular pulse.

According to the report, Resident Fifteen's counsel was focusing her efforts on pain control problems at the facility.  *Id.* at 15.  Against orders, Resident Fifteen was given little pain medication on some days and on other days he was given no pain medication at all.  The record is not clear regarding the days that Resident Fifteen was not given the appropriate amount of pain medication.

Extensive discovery was taken about the Manor Care facility.  The report summarized several reports from former facility employees who criticized the facility.  The former employees

29

explained it to be short-staffed with heavy patient care assignments. Claims were made that there was not enough staff to turn patients every two hours or keep patients clean. One former nurse who cared for Resident Fifteen said that he suffered a great deal of pain during his stay and that pain medicines were not given to him despite her recommendations. Another nurse admitted that Resident Fifteen's record included false documentation. On some occasions, the facility was not criticized, but it is apparent that several former employees believed there to be ongoing shortcomings of the facility where Resident Fifteen stayed that impacted Resident Fifteen.

This suit was settled for $1,600,000. Manor Care argues that systematic injuries during the covered period such as the facility's shortcomings, an ulcer, malnutrition, dehydration, and inadequate pain management could cause a reasonable person to conclude that Manor Care is entitled to proceeds. First Speciality responds that claims such as the understaffing and bad charting do not constitute occurrences resulting in personal injury as defined in the First Specialty policy.

Here, the facility's repeated shortcomings described by former employees raises a question of material fact regarding whether the same ongoing negligence amounts to a single occurrence that caused the injuries during the covered period thus warranting the application of a single SIR. Furthermore, in this case, the Court will not make calculations about the value of injuries that occurred during the covered period. These will be the subjects at trial. First Speciality's motion with regard to Resident Fifteen is denied.

**P. Resident Sixteen**

30

Resident Sixteen stayed at the Manor Care facility between June 14, 1999 and January 2, 2000, all of which is within First Speciality's policy period.  First Speciality Exhibit X.  As a result, the only issue to determine is whether First Speciality owes anything over Manor Care's $500,000 per occurrence SIR.

The facility where Resident Sixteen stayed failed to meet industry standards on more than one occasion during Resident Sixteen's stay.  *Id.* at 2.  On October 5, 1999, the Agency of Health Care Administration observed a medicine cart overstocked with medications due to improper ordering.  On November 19, 1999, the facility was revisited in conjunction with a representative from the Bureau of Investigative Services.  Manor Care was cited for failing to meet standards of appropriate quality and clinical practice.  The investigation revealed that nurses failed to use appropriate techniques and standards involving medications and one nurse was observed signing off the medications long prior to administering the medication.  The facility was also cited for failing to provide pharmaceutical services to meet the needs of residents.

Manor Care's attorney anticipated that Resident Sixteen's suit would focus on three incidents.  First was a failure to provide adequate and appropriate healthcare when Resident Sixteen was allegedly dropped as a result of an improper transfer from her bed to her wheelchair.  Second was the development and worsening of skin wounds as a result of Manor Care's failure to implement an appropriate amount of physical therapy and administer necessary activity sessions.  Third was the failure to provide adequate and appropriate care due to the existence of a narcotics diversion issue that involved Resident Sixteen's medication and her treating nurse.  There were several inconsistences in the records regarding the administration of pain medication.

31

This case was settled for $2,900,000. First Speciality argues that separate SIRs apply to each of the injuries. However, the facility's repeated failures to meet industry standards during the covered period and the repeated injuries during covered period support the possibility that Resident Sixteen's continuous deterioration was caused by ongoing negligence that amounts to a single "occurrence," thus warranting the application of a single SIR. In this case, the Court will not make its own calculations for the value of the injuries that occurred during the covered period. These will be the subjects at trial. First Speciality's motion with regard to Resident Sixteen is denied.

## IV. United's motion for summary judgment

United's motion for summary judgment argues that coverage under its policy cannot be triggered because First Speciality's limits will not be exhausted. The Court notes that while Manor Care and United claim there to be over $8 million in limits left in the First Speciality policy, there may actually be less than $7 million.[8]

United's argument was premised on Manor Care's initial estimate of the amounts owed to it on then remaining claims, which was a total of $4,890,000. Manor Care believes that it is premature to rule on United's policy limits because a fact finder could consider expert Nooney's report and other evidence and determine that First Speciality must reimburse Manor Care even

---

[8] As of July 1, 2008, according to the Senior Vice President of First Specialty's parent company, First Speciality had paid or committed to pay over $18 million of its $25 million limit in satisfaction of claims against Manor Care. First Speciality Exhibit B. This would mean that less than less than $7 million in limits remain. However, Manor Care believes that $8,116,500 in limits remain in the First Specialty policy. United Exhibit 3; First Speciality Exhibit H.

more than previously allocated.  Manor Care points out that its initial allocation was expressly subject to change pending Manor Care's expert report.

This order grants summary judgment to First Speciality on eleven out of sixteen disputed cases.  As a result, far less insurance proceeds are at stake.  Even assuming that Manor Care will be victorious on all five of the remaining underlying cases and assuming that First Speciality has less than $7 million in limits remaining, United's excess layer cannot be reached.

**V. Conclusion**

For the reason discussed herein, Defendant First Speciality's motion for summary judgment (Doc. 118) is hereby granted in part and denied in part, and Defendant United's motion for summary judgment (Doc. 120) is hereby granted.

IT IS SO ORDERED.

　　 s/ *David A. Katz*　　
DAVID A. KATZ
U. S. DISTRICT JUDGE

33